THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                              Criminal No. 3:25-cr-030

CARSHAWN FULLER,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on the DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, TESTIMONY AND EVIDENCE UNDER THE FOURTH AMENDMENT (ECF No. 29) ("Renewed Motion to Suppress"), the GOVERNMENT'S POST-HEARING RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS (ECF No. 30) ("Resp."), and the DEFENDANT'S REPLY RE: SUPPRESSION (ECF No. 31) ("Reply"). Having reviewed the pleadings, the papers, the testimony, and the exhibits, and, for the reasons set forth below, the Renewed Motion to Suppress will be DENIED.

## PROCEDURAL BACKGROUND

On March 4, 2025, a grand jury returned the INDICTMENT (ECF No. 1) that charged Carshawn Fuller ("Defendant" or "Fuller") with one count of Possession of a Firearm by a Convicted Felon ("COUNT I"). ECF No. 1. On June 16, 2025, Fuller filed the following motions: (1) DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, TESTIMONY

AND EVIDENCE UNDER THE FOURTH AMENDMENT (ECF No. 13) ("Motion to Suppress"); (2) MR. FULLER'S MOTION TO DISMISS THE INDICTMENT BECAUSE 922(A)(20) IS VOID FOR VAGUENESS (ECF No. 14) (the "Void for Vagueness Motion to Dismiss"); and (3) MR. FULLER'S MOTION TO DISMISS THE INDICTMENT (ECF No. 15) (the "Bruen Motion to Dismiss"). On July 18, 2025, the Void for Vagueness Motion to Dismiss and the Bruen Motion to Dismiss were denied. ECF Nos. 27, 28.

On July 9, 2025, the Court held an evidentiary hearing on the Motion to Suppress in which Henrico County Police Department ("HCPD") Officers Aubrey Hughes and Michael Geukgeuzian testified. Hearing Transcript, July 9, 2025 ("H.T. 7/9/25") (ECF No. 26). Following that hearing, additional briefs were ordered (ECF No. 25) to take into consideration the evidence produced at the evidentiary hearing which differed significantly from the facts asserted in the Motion to Suppress and related briefing. On July 22, 2025, Fuller filed the Renewed Motion to Suppress. Based on the filing of a renewed motion, the Motion to Suppress was denied as moot.

The facts underlying this case, as illustrated through the exhibits and the witness testimony, are as follows.

## FACTUAL BACKGROUND

### A. 911 Call

On December 27, 2024, around 12:06 p.m., HCPD received a 911 call from Terry Dickens reporting a domestic disturbance at her home, 5868 Kirkstone Circle. 911 Call Audio, Ex. 1. Ms. Dickens told the 911 operator that she was "tired of arguing with my daughter. I want you to come here and get her and her boyfriend the f**k out of my house." 911 Call Audio Transcript, Ex. 1A. Ms. Dickens provided the 911 operator with her name and her daughter's name (Brianna Bryce). Id. Without further prompting from the 911 operator, Ms. Dickens laid out her reasons for the call:

> [My daughter's boyfriend] keep starting shit between me and [Ms. Bryce] and I'm tired of it. So, when she says something to me about it, I'm talking to [Ms. Bryce] and talking to [her boyfriend] and [Ms. Bryce] just goes the f**k off. I'm tired of it. I'm not doing it. You not paying no rent or not bills or doing nothing. You grown, so get the f**k on. I'm tired of it.

Id. The 911 operator asked Ms. Dickens the name of her daughter's boyfriend, and Ms. Dickens' replied "Carshawn." Id. She continued that she did not know his last name. Id. Ms. Dickens then confirmed to the 911 operator that she did not "think" any of the individuals involved had any weapons, and that she did not "think" anyone involved was intoxicated. Id. After confirming the address for the call, the 911 operator informed Ms. Dickens that HCPD officers would be responding shortly. Id.

Why, one might reasonably ask, would police resources be dispatched to address such a personal and relatively trivial matter as this? The response on the record is that such domestic situations too often lead to or involve violence so dispatches, such as the one in this case, can serve a preventive purpose by having officers defuse the potential for escalating violence. That, according to the record, requires police officers to interview the people involved. As discussed below, that process was what took place when the police responded to Ms. Dicken's request.

## B. Response to 5868 Kirkstone Circle

On the afternoon of December 27, 2024, HCPD Officers Geukgeuzian (assigned to HCPD Unit 243, the HCPD patrol area in which 5868 Kirkstone Circle is located) and Hughes (assigned to the neighboring patrol area, HCPD Unit 242) were on their respective patrols. At 12:09 p.m., dispatch for HCPD's Central Station came over the radio, and stated, "243, 242, copy a domestic." Transcript of Central Station Radio Traffic, Ex. 2A. Both officers responded with their respective codes to acknowledge receipt of the radio transmission. Id. Dispatch then assigned the officers the call:

> 243, 242, show both units responding out to 5868 Kirkstone Circle, 5868 Kirkstone Circle. See your complainant, Terry Dickens who's having a dispute with her daughter, Brianna Bryce, and the daughter's boyfriend, Keyshawn, unknown last name, that she wants

4

out of the home reference an argument. Unknown weapons. No intox.

Id. Officers Hughes and Geukgeuzian again responded with their respective codes to acknowledge receipt of their assignment. Id.

At 12:19 p.m., Officer Hughes and Geukgeuzian arrived at 5868 Kirkstone Circle. Government Timeline, Ex. 10. When the officers arrived, Ms. Dickens was waiting outside the front of her two-story townhouse and she confirmed that she was the 911 caller. Officer Hughes Body-Worn Camera Footage, Ex. 4. Ms. Dickens immediately explained to the officers her reasons for making the 911 call for a domestic disturbance. Transcript of Officer Hughes Body Worn-Camera Footage, Ex. 4A, at 1. She was upset that her daughter and her boyfriend were staying in the townhouse but were not paying rent or helping with upkeep (through chores such as taking out the trash). Id. Ms. Dickens informed the officers that she had seen daughter's boyfriend that morning and that they said good morning to each other before she headed out on an errand. Id. After Ms. Dickens left the townhouse, she received a text from her daughter complaining that Ms. Dickens had ignored her boyfriend. Id. When Ms. Dickens returned to the townhouse, her daughter was mad and began "going the f**k off on her" about what had happened that morning. Id. As a result, Ms. Dickens told Ms. Bryce that she and her boyfriend were to leave the townhouse. Id. Her daughter

reportedly became infuriated and responded by calling Ms. Dickens harsh and insulting names. Id.

While outlining her complaint against her daughter and her daughter's boyfriend, Ms. Dickens shared with the officers that her daughter was also "on the lease" for the townhouse. Id. Officer Hughes listened to what Ms. Dickens had to say, then explained that he would attempt "to do everything I can to get them out. It don't matter that she don't' pay nothing. Okay? If her name's on this lease, then technically I can't do anything." Id. He explained that Ms. Dickens would have to use the civil eviction process to have her daughter removed from the apartment. Id.

Officer Hughes and Ms. Dickens then spoke about whether the boyfriend contributed financially to the townhouse, to which Ms. Dickens explained that the boyfriend was not on the lease, had not paid any bills related to the townhouse, and had not received any mail there. Id. at 1-2.

At that point, Officer Hughes began questioning Ms. Dickens about the boyfriend, and asked what he did for a living. Id. Ms. Dickens responded, "I don't f*****g know, and I don't give . . . a f**k." Id. at 2. While Ms. Dickens made that statement, she gave a look of what is best described as incredulity towards Officer Hughes. See Ex. 4, at 12:23:55-59. Officer Hughes testified, however, that he took Ms. Dicken's response, coupled with the "look," to indicate that Fuller may be involved in some type of

6

criminal activity. H.T. 7/9/25, at 23:10-24:6. In Officer Hughes'
experience, individuals in high crime areas often do not expressly
tell police officers that a particular individual is engaging in
criminal activity but instead tend to use non-verbal
communications, including physical gestures to hint at what the
criminal activity may be ongoing or where it may be taking place.
Id.

Officer Hughes then told Ms. Dickens, "I don't agree with the
law" about the removal process, but that, if Ms. Bryce told him to
"kick sand," then there's nothing he could do to have her removed.
Ex. 4A, at 2. However, Officer Hughes also advised Ms. Dickens
that, because her daughter's boyfriend does not get mail there or
pay rent, it might be possible to remove him from the townhouse.
Id. Officer Hughes then had Ms. Dickens confirm her daughter's
first name and the first name of her boyfriend, "Carshawn." Id.
Ms. Dickens confirmed to Officer Hughes that her daughter was still
"acting crazy" and that is why she had left the townhouse and had
been waiting outside for the police to arrive. Id.

### C. Interactions with Ms. Bryce and Carshawn Fuller

After finishing their conversation with Ms. Dickens, Officers
Hughes and Geukgeuzian walked up to the townhouse and knocked on
the door. Ex. 4, at 12:24:40-12:24:50. Ms. Bryce opened the door
part way so that the officers could see her face but could not see
into the townhouse. Id. at 12:24:50-12:24:56. Officer Hughes

asked, "do you mind if we come in?" Id. at 12:24:54-12:25:00. Ms. Bryce responded "gimme one second." Id.

However, Ms. Bryce also quickly closed the door. Id. Officer Hughes testified that he heard the deadbolt lock when the door closed. H.T. 7/9/25, at 26:1-11.[1] Officer Hughes testified that, in his experience as a police officer, behavior such as quickly closing and locking a door when faced with a police officer does not happen "very often in domestic disputes" but that it is common when dealing with an individual who is engaged criminal activity or who has an outstanding arrest warrant. H.T. 7/9/25, at 26:12-27:14.

Shortly after the door was closed and locked, Officer Hughes told Officer Geukgeuzian, "I shouldn't have asked that, I should have just went in." Ex. 4A, at 2. Nonetheless, the officers waited by the closed door for about a minute before Officer Hughes knocked again. Ex. 4, at 12:25:00-12:25:56. About 15 seconds later, Officer Hughes then knocked on the door for a third time. Id. at 12:25:56-12:26:13. While Officer Hughes was knocking on the door for the third time, Ms. Bryce yelled, "I'm coming," to which Officer Hughes responded, "alright honey, I'm not standing out here all day." Id. at 12:26:12-12:26:16.

---

[1] That locking sound is audible on Officer Hughes' body-worn camera footage. Ex. 4, at 12:24:54-12:25:00.

The officers continued to wait by the door until, a little over half a minute later, Ms. Dickens interjected, "like I said that tells you all what he does for a living, because what the f**k is y'all doing?" Id. at 12:26:16-12:27:00. Officer Hughes testified that he took this statement, in tandem with the "look" that Ms. Dickens had given him earlier (when he asked about what Carshawn did for a living) to indicate that "there's obviously something else going on" and that Ms. Dickens recognized that it was "not normal for a person to act the way that her daughter and Mr. Fuller were." H.T. 7/9/25, at 29:7-20. Ms. Dickens also informed the officers that the residence had a back door. Ex. 4, at 12:26:16-12:27:00.

At that point, HCPD Officer Moore arrived on the scene. Officer Hughes generally informed Officer Moore of the situation, and, in so doing, explained: "we really don't have anything criminal yet," so that Officer Moore would know that the officers "didn't have any criminal charges to charge them with" at that time. Id.; H.T. 7/9/25, at 29:24-30:12. After overhearing that statement by Officer Hughes, Ms. Dickens interrupted, "pretty sure he [Carshawn] got a warrant y'all." Id. Officer Hughes then asked Ms. Dickens "is that why?", indicating that he was referring to the locking of the door. Id. Ms. Dickens confirmed that she was "pretty sure." Id. at 12:27:00-12:27:07. While not visible on Officer Hughes' body-worn camera footage, Officer Hughes testified

9

that Ms. Dickens, while making the statement that "Carshawn" had an arrest warrant, gave him a similar look as the one she had given him previously when he had asked about what Carshawn did for a living. H.T. 7/9/25, at 31:15-32:4. To Officer Hughes, this look indicated that she was telling him, "yes, you know, he's got one, you know." Id. Officer Hughes then knocked on the door for a fourth and final time. Id. at 12:27:07-12:27:17. Shortly after that, Officer Geukgeuzian walked around the side of the townhouse to its back door to join Officer Moore who had taken up a position at the back porch of the townhouse. Id. at 12:27:17-20; Officer Moore Body-Worn Camera Footage, Ex. 5, at 12:27:29-12:28:00.

Around 12:27 p.m., Fuller exited the back door of the townhouse with three backpacks—two on his shoulder and the other in his hand. Id. He also had a pair of shoes in his hands. Id. Ms. Bryce quickly followed Fuller out of the apartment, and Fuller closed the door behind them. Id. When Ms. Bryce came out of the townhouse, she was holding her cellphone while speaking to someone on its speakerphone.[2] Id.

Using the radio, Officer Moore advised Officer Hughes that, "they're around back." Ex. 4A, at 3. Officer Hughes asked Officer Moore, "y'all good back there," to which Officer Moore responded back "negative." Id. Officer Hughes immediately began walking to

---

[2] Officer Moore's body-worn camera footage (Ex. 5) has no audio for about thirty seconds until it is turned on.

the back door, where he encountered the two officers, Ms. Bryce, and Fuller. Ex. 4, at 12:27:40-12:28:00.

So, at this point, the officers were engaged in interviewing two of the participants to the domestic dispute that had prompted the dispatch in the first place. Officer Geukgeuzian was already trying to speak with Ms. Bryce (who was very agitated), and she was telling him that she had not touched her mother in the lead up to the 911 call. Id. at 12:27:55-12:28:02. Officer Hughes entered that conversation by asking Ms. Bryce to "hang tight," while Officer Geukgeuzian positioned himself in front of her and put his hands up in front of her. Id. at 12:28:02-12:28:10. Officer Hughes began speaking to Ms. Bryce again, but paused to instruct Fuller, "my man stay over here," because Fuller had started walking away to ash his cigar. Id. at 12:28:10-12:28:17. Fuller complied with the instruction by raising his free hand and returning to where he had been standing on the patio. Id.

Officer Hughes told Fuller that "if you got a warrant, we'll fix it alright." Id. Fuller responded, "I ain't got nothing to do with it," and Ms. Bryce joined in that protest. Ex. 4, at 12:28:17-12:28:45. Nonetheless, Fuller remained on the patio as previously instructed Officer Hughes. Id.

To further the investigation, Officer Hughes asked Fuller for his name. Id. at 12:28:45-12:29:30. Fuller replied that his name was "Carmone" and spelled the name. Id. He then told Officer Hughes

11

that his last name was Fuller and spelled it out. Id. Fuller informed Officer Hughes that he did not know his social security number, that his birth date was February 5, 2000, and that he did not have a phone number. Id.

After gathering that information, Officer Hughes, using his shoulder radio requested dispatch to run an identity check to determine if there were any outstanding arrest warrants for Carmone Fuller. Ex. 4A, at 4. Dispatch responded that the given name and date of birth was "not coming back on file." Id. at 5. Officer Hughes again asked Fuller for his name, and Fuller repeated that his name was Carmone Fuller, but changed his birth year to 2001 (having previously told Officer Hughes that his birth year was 2000). Id. at 6. Officer Hughes gave the updated information to dispatch. Id. at 7.

While waiting for dispatch to process that information, Officer Hughes asked Fuller to pull up the balaclava that was covering his neck. Id. at 7. Fuller complied. Id. Officer Hughes noticed that Fuller had a tattoo of "Chucky," a fictional horror movie character, on his neck. Id. Officer Hughes then began walking back to his police cruiser so he could access certain databases through the computer located in the cruiser, leaving Fuller and Ms. Bryce with the other officers. While Officer Hughes was en route to the patrol car, dispatch informed him that, again, the

12

provided name and date of birth was "not coming back on file either." Id.

Officer Hughes entered his cruiser and began running the information that he had available to him through two law enforcement databases. H.T. 7/9/25, at 52:4-54:22. First, he ran "Carmone's" information through "Darwin," an internal HCPD database. Id. He then ran that same information through "LINX," a database with the capability to pull up known associates of individuals. Id. His search in LINX for Carmone Fuller pulled up Carshawn Fuller as a known associate. Id. The LINX database provided a photograph of Carshawn Fuller's face with the Chucky tattoo standing out on his neck. Id. The LINX system showed further that Carshawn Fuller had active arrest warrants in two jurisdictions. Id. Officer Hughes then confirmed Carshawn Fuller's identity through another police database which contained a clearer photograph of Fuller's face and neck tattoo. Id.

Officer Hughes exited his police vehicle and walked over to Ms. Dickens. Officer Hughes' Body-Worn Camera Footage Pt. 2, Ex. 8. He received from Ms. Dickens the key to her residence and her consent to go inside. Id. Officer Hughes entered the apartment through the front door and walked to the back. Id. He then gave a signal for "handcuffs" to the officers who were outside with Fuller and Ms. Bryce, exited the back door of the townhouse, and told Fuller to put his hands behind his back. Id. Officers then

handcuffed Fuller, and Fuller said to Officer Hughes, "get this gun out of my bookbag, get this gun out my bookbag," while nodding his head down toward the backpack he was wearing. <u>Id.</u> Officer Geukgeuzian retrieved the firearm that Fuller is charged with possessing in this case and a loaded magazine from the backpack. <u>Id.</u> Fuller then confirmed to Officer Hughes that he is a felon and acknowledged that he knew that he had outstanding warrants for his arrest. <u>Id.</u> Officers would later check the backpack a second time and recover a second loaded magazine. <u>Id.</u>

DISCUSSION

## A. Reasonable Suspicion: Legal Standard

The Fourth Amendment protects "persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "The protection against unreasonable seizures includes 'brief investigatory stops.'" <u>United States v. Curry</u>, 965 F.3d 313, 319 (4th Cir. 2020) (quoting <u>United States v. Kehoe</u>, 893 F.3d 232, 237 (4th Cir. 2018)). These stops, referred to as <u>Terry</u> stops, "are not subject to the Fourth Amendment's higher standards for probable cause and warrant requirements." <u>Id.</u> (citing <u>United States v. Holmes</u>, 376 F.3d 270, 275 (4th Cir. 2004). Instead, "[u]nder well-established doctrine, a police officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop—known as a '<u>Terry</u> stop'—predicated on **reasonable, articulable suspicion that 'criminal activity may be**

14

**afoot.'"** United States v. Mitchell, 963 F.3d 385, 390 (4th Cir. 2020) (emphasis added) (quoting Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Reasonable suspicion need not rise to the level of probable cause but "'requires at least a minimal level of objective justification for making the stop.'" Id. (quoting Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). In deciding whether reasonable suspicion exists, courts consider "'the totality of the circumstances—the whole picture.'" United States v. Sokolow, 490 U.S. 1, 8 (1989) (quoting United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Importantly, "[f]acts innocent in themselves may together amount to reasonable suspicion; officers are permitted to conduct investigative stops 'based on what they view as suspicious—albeit even legal—activity.'" Mitchell, 963 F.3d at 390 (quoting United States v. Perkins, 363 F.3d 317, 326 (4th Cir. 2004)). "In reviewing police action, courts must look at whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of 'the practical experience of officers who observe on a daily basis what transpires on the street.'" United States v. Bowman, 884 F.3d 200, 213 (4th Cir. 2018) (quoting United States v. Branch, 537 F.3d 328, 336–37 (4th Cir. 2008) (internal quotation marks omitted)). The Government has the burden to prove by a preponderance of the evidence that

15

the Terry stop at issue did not violate the Fourth Amendment. United States v. McGee, 736 F.3d 263, 269 (4th Cir. 2013) ("the government has the "burden of proof in justifying a warrantless search or seizure.").

**B. Moment of Seizure**

The first issue for decision is: when was the moment that Fuller was seized by Officer Hughes because it is at that moment of seizure that reasonable suspicion must exist. See, e.g., United States v. Peters, 60 F.4th 855, 862 (4th Cir. 2023) ("we must first establish when he was seized, and then determine if reasonable suspicion justified the seizure.").

"A seizure, as understood under the Fourth Amendment, occurs '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" Id. (quoting Terry, 392 U.S. at 19 n.16, 88 S.Ct. 1868). "This is measured by whether, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Id. (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (plurality opinion)). A "seizure," occurs when an officer employs "'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." Torres v. Madrid, 592 U.S. 306, 311, 141 S. Ct. 989, 995, 209 L.Ed.2d 190 (2021)

16

(alteration in original) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868).

The parties agree that Fuller was seized when he began to move away from the patio and Officer Hughes ordered him to "stand right there," an instruction with which Fuller complied. Renewed Motion to Suppress at 5; Resp. at 13. The Court agrees as well. At the moment Fuller complied with Officer Hughes' command to "stay right there," the seizure was completed because Fuller voluntarily submitted to Officer Hughes's show of authority. <u>See Torres</u>, 592 U.S. at 322, 141 S. Ct. 989 ("Unlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement."). It is at that moment that Officer Hughes' reasonable suspicion is assessed.

### C. Reasonable Suspicion

The test for whether there was reasonable suspicion that criminal activity is, or may be, afoot is made upon consideration of the totality of the circumstances at the time of seizure. But that analysis becomes somewhat more complicated when a tip from an informant is relied upon in the formation of reasonable suspicion. If that is the case, a preliminary decision must be made on whether that tip is sufficiently reliable to be considered in the totality of the circumstances. In this case, the record shows that the tip from Ms. Dickens ("I'm pretty sure he got a warrant y'all") was

part of the totality of the circumstances that criminal activity was afoot (a warrant for Fuller's arrest). Thus, it is first necessary to determine whether the tip given by Ms. Dickens is sufficiently reliable to be considered as a part of the totality of the circumstances extant when Fuller was seized after exiting the back door of the townhouse.

### i. Reliability of Ms. Dicken's Statements

The Supreme Court has considered the reliability of tips from anonymous tipsters in determining the propriety of Terry stops in several cases, most notably in Florida v. J.L., 529 U.S. 266 (2000). In J.L., the Supreme Court held that an anonymous 911 call must be corroborated to create sufficient indicia of reliability:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. **The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.** Cf. 4 W. LaFave, Search and Seizure § 9.4(h), p. 213 (3d ed.1996) (distinguishing reliability as to identification, which is often important in other criminal law contexts, from reliability as to the likelihood of criminal activity, which is central in anonymous-tip cases).

Id. at 272 (emphasis added). In J.L., the Supreme Court established that a fully anonymous tip deemed to be unreliable, standing alone, did not give an officer reasonable suspicion to effectuate a Terry stop. Id. at 274. Fuller relies on J.L. for the principle that

unreliable tips do not afford a basis for establishing reasonable suspicion.

However, the facts of this case do not present an anonymous tip. Here, the tip was given in a face-to-face interaction with a police officer. In <u>United States v. Christmas</u>, the Fourth Circuit found that a tip from a citizen informant who had provided police with her home address in a face-to-face encounter was "more trustworthy and reliable than the anonymous tip at issue in <u>J.L.</u>" 222 F.3d 141, 144-145 (4th Cir. 2000). That is because known informants' credibility can be tested and they may be subjected to legal repercussions for making false allegations. <u>Id.</u> at 144 (finding that a face-to-face "conversation with the informant provided [the officer] with an opportunity to assess her credibility and demeanor" and that "unlike [an] anonymous tipster, a witness who directly approaches a police officer can also be held accountable for false statements.").

In this case, Ms. Dickens identified herself to the 911 operator when she made the 911 call. That identification was then pushed to Officer Hughes when he received the details of the call over the radio from dispatch. Officer Hughes then approached Ms. Dickens, already aware of her identity, when she was standing outside of the residence she had identified in the 911 call. Throughout their interactions, Ms. Dickens knew that Officer Hughes was aware of her identity and that he knew where she could

be located (at her home which they were currently standing in front of), thus her credibility and the reliability of her tip are both bolstered under the Fourth Circuit's decision in Christmas and its progeny. See Mitchell, 963 F.3d at 393-394; see also United States v. DeQuasie, 373 F.3d 509, 523 (4th Cir. 2004) ("[the informants] met face-to-face with [the police officer] when they reported the information to him for preparation of the missing person report. In doing so, they provided [the police officer] with an opportunity to observe their demeanor and assess their credibility, and they also exposed themselves to potential criminal liability for filing a false report.").

Of course, the fact that this was a face-to-face interaction and that the tip possesses the identifiability and accountability components of reliability does not alone mean that the tip is eligible to be considered in the analysis of the totality of the circumstances. It is settled that, "in situations such as this, where an informant's tip is crucial to the finding of reasonable suspicion, the tip must possess 'sufficient indicia of reliability.'" See United States v. Powell, 2011 WL 916301, at *3 (N.D.W.Va. Mar. 16, 2011) (citing United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004) ("In cases where an informant's tip supplies part of the basis for reasonable suspicion, we must ensure that the tip possesses sufficient indicia of reliability.") (citations omitted)). In this case, the information that Ms.

20

Dickens supplied was crucial to the finding of reasonable suspicion because it supplied the "criminal activity" component of the reasonable suspicion calculus.

The reliability analysis in this case needs to be divided into the two parts that the Government argues are to be considered in the reasonable suspicion analysis: (1) the "look" that Ms. Dicken's gave Officer Hughes which is said to have precipitated his suspicion that Fuller was engaged in criminal activity and the related follow-up statement; and (2) Ms. Dickens' statements that she was "pretty sure" that Fuller had an outstanding arrest warrant.

### (1) The "Look" and the Related Follow-Up Statement

The first tip on which the Government relies to establish Officer Hughes' reasonable suspicion is the "look" that Ms. Dickens gave Officer Hughes after he asked what Fuller did for a living, and the later statement that is said to have confirmed that Fuller was engaged in criminal activity. First, the "look." Ms. Dickens responded to Officer Hughes question about Fuller's line of work with the statement, "I don't f*****g know, and I don't give . . . a f**k." Ex. 4A, at 2. While making that statement, Ms. Dickens made a facial expression that, according to the Government, bespoke that Fuller was engaged in some kind of criminal activity. See Ex. 4, at 12:23:55-59.

The Government argues that this "look" should be considered in context with a later statement that Ms. Dickens made to the officers while they were waiting outside for Ms. Bryce to open the door. Specifically, Ms. Dickens said: "Like I said, that tells y'all what he does for a living, because what the fuck is y'all [Fuller and Mr. Bryce] doing?" Ex. 4, at 12:26:16-12:27:00. That statement is followed, and is asserted to be related to, Ms. Dicken's view as to Fuller's line of work. The Government argues that placing that statement in context confirms that Ms. Dickens earlier "look" indicated that "Fuller was engaged in some type of criminal conduct and could be hiding evidence of it." Resp. at 21.

It is unclear what criminal activity the Government asserts to be identified by the "look" and the attending statement. That, no doubt, is, in part, because there is no assertion being made by Ms. Dickens as to any particular type of criminal wrongdoing in which Fuller was involved. The "look" and the general statement "that tells y'all what he does for a living" is not an assertion that Fuller is engaged in any kind of criminal activity. The Government's position to the contrary is based on the inference that, in making the statement, Ms. Dickens was telling the officers that Fuller is in a criminal line of work. But, that inference is not a permissible one because, at the same time, Ms. Dickens also told Officer Hughes that she did not know what Fuller did for work.

22

Ex. 4A, at 2 ("I don't f*****g know. And I don't . . . give a f**k.").

Moreover, the predicate for the Government's position fails. That position is based on Officer Hughes' testimony that individuals in high-crime areas often refuse to speak with police about ongoing criminal activity but may advise of criminal activity through non-verbal physical gestures (here, the "look"). H.T. 7/9/25, at 23:10-24:6. The Court credits Officer Hughes' on-the-job experience as sufficient to establish the fact that individuals in high-crime areas often communicate information about criminal activity by using non-verbal gestures, rather than words. But that credit does not suffice to permit consideration of the opinion that the "look" was a non-verbal communication intended to inform that Fuller was engaged in, or about to engaged in, criminal activity. First, the record does not establish that Officer Hughes was experienced in, or had expertise in, the interpretation of "looks." Second, as explained, the evidence permits the Court to assess the "look," and it is best described as a look of incredulity. In any event, there is nothing about the "look" that reasonably can be described as communicating that Fuller was engaged in criminal activity. So, those two asserted bases of reliability for Ms. Dickens' tip do not exist. And, without indicia of reliability other than that the proposed statements were given in a face-to-face interaction, the "look" and Ms. Dickens' follow-

23

up statement cannot be considered as sufficiently reliable to be included in the totality of the circumstances analysis.[3]

### (2) Outstanding Arrest Warrant

The reliability of Ms. Dickens' statement to the officers that she was "pretty sure he [Carshawn] got a warrant y'all" is quite a different story. In fact, both parties agree that an outstanding warrant satisfies the criminal activity "may be afoot" facet of the reasonable suspicion analysis. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1. That statement was a direct assertion of criminal activity and was credible based on the surrounding circumstances.

Before making the report that Fuller had a warrant, Ms. Dickens had spoken at length with Officers Hughes about her relationship with her daughter (Ms. Bryce) and her daughter's boyfriend (Fuller). She had already told the officers about Fuller's daily habits (e.g. sleeping all day), that he had been living in her home, that he had spent the night before in the home, that he had been causing issues in the home, and that he was not contributing to the home monetarily or otherwise. See Ex. 4A, at 1-2. Ms. Dickens had established a strong basis for her personal

---

[3] Evidence from experts on facial expressions and body language can be considered in many different contexts, including the analysis of reasonable suspicion, but the Government does not Officer Hughes as an expert on that issue.

knowledge about Fuller before she informed the officers that she was "pretty sure" that he had an outstanding warrant.

And, because the tip was given face-to-face, Officer Hughes was able to "judge the credibility of [Ms. Dickens] firsthand" and determine for himself "whether the tip is sufficient reliable to support reasonable suspicion." Perkins, 363 F.3d at 323 (citations omitted). Officer Hughes testified that, when determining if Ms. Dickens' tip about Fuller having an outstanding warrant was reliable, he took into consideration the totality of the circumstances that surrounded him, including: the information that Ms. Dickens' had provided him with about her personal relationship with Fuller, Ms. Dicken's demeanor while she made the statement, and how Ms. Bryce had reacted to his presence at the door (shutting the door quickly and locking it). H.T. 7/9/25, at 32:5-34:13; 92:12-15; 106:6-14. In sum, Officer Hughes had the opportunity to judge Ms. Dicken's credibility firsthand and that helped him to assess whether the tip was sufficiently reliable to be considered in making the reasonable suspicion assessment. Perkins, 363 F.3d at 323.

Fuller's rebuttal is that Ms. Dickens' tip should not be afforded the credibility boost afforded to face-to-face interactions under Christmas for five reasons: (1) Officer Hughes stated that he took the tip from Ms. Dickens on "face value"; (2) Officer Hughes failed to take other actions to corroborate the tip

25

as reliable before detaining Fuller; (3) Officer Hughes did not rely upon any personal knowledge of Ms. Dickens that Fuller had an arrest warrant, but only upon information that Ms. Dickens provided about her personal relationship with Fuller in deeming the tip reliable; (4) the tip was a mere "hunch" of Ms. Dickens that Fuller had an outstanding warrant; and (5) Ms. Dickens did not make a statement that would allow police to hold her accountable as envisioned by the Fourth Circuit in Christmas.

The first argument is predicated upon Officer Hughes testimony that there was "nothing I could do to see how reliable of a source she was. I had to take her on face value." H.T. 7/9/25, at 88:16-89:22. Officer Hughes did say that, but the quote is taken out of context from his overall testimony. As discussed above, Officer Hughes testified that he did not take the information solely on face value, but also relied upon the totality of the circumstances that confronted him, including: the information that Ms. Dickens' provided to him about her personal relationship with Fuller, her demeanor when providing that information, and Ms. Bryce's evasive behavior before Ms. Dickens gave the tip. H.T. 7/9/25, at 32:5-34:13; 92:12-15; 106:6-14. Therefore, this argument does foreclose the consideration of Ms. Dickens' tip in making the reasonable suspicion analysis.

Second, Fuller argues that, in hindsight, there were actions that Officer Hughes could have taken to have corroborated the

26

reliability of Ms. Dickens. Specifically, Fuller argues that Officer Hughes could have run a background check on Ms. Dickens while she was providing that information, which would have revealed that she had prior convictions for forgery and identity theft, and could have questioned Ms. Dickens about why she believed that Fuller had a warrant. Hindsight is not the standard to which police are, or should be, held in such circumstances.

Fuller does not cite any decision in support of the argument that amounts to a standard that officers should take all possible actions to dispel uncertainty surrounding a tip. See Renewed Motion to Suppress at 12. That, of course, would be an impractical standard to apply, and this case illustrates why. Officer Hughes was standing by the front door waiting for Ms. Bryce to return to speak with him when Ms. Dickens informed Officer Hughes that she was "pretty sure" that Fuller had a warrant. Officer Hughes was actively investigating a domestic disturbance call that presented a potential to become volatile. Officer Hughes was properly acting within his discretion and relying on his experiences as a police officer to choose how to best proceed in potentially volatile circumstances, and one that called for interviewing all participants. Checking to see if Ms. Dickens had previous convictions for false statements should have been, and was properly, a low priority at that time. No decision supports the standard urged by Fuller.

27

Third, Fuller argues that the tip is insufficiently reliable because Ms. Dickens only provided information as to her personal relationship with Fuller instead of facts proving her personal knowledge that Fuller had an outstanding warrant. The Fourth Circuit's characterization of the facts in Christmas helps to assess this point:

> [I]n Christmas, we held that that an unsolicited in-person tip from an unnamed, intoxicated woman who indicated that her neighbor two houses down had drugs and guns was sufficiently reliable to support a Terry stop. We reasoned that the informant's credibility was bolstered by the close proximity of her home to the alleged illegal activities—suggesting a basis for knowledge—and her proximity to the alleged illegal activities when she reported the information to the police in public, thereby exposing herself to the risk of reprisal.

United States v. Mitchell, 963 F.3d 385, 393 (4th Cir. 2020) (citing Christmas, 222 F.3d at 143-144). Here, Ms. Dickens was in even closer proximity to the individual at issue because she was sharing her home with Fuller (compared to living two doors down) and she had made Officer Hughes aware of that fact as well as others showing a rather detailed knowledge about Fuller and his activities. The extent and intimacy of Ms. Dickens' knowledge about Fuller added credence to her assertion that "he [Fuller] got a warrant[.]"

Fourth, Fuller characterizes Ms. Dickens statement that she was "pretty sure" that Fuller had a warrant as an insufficient "hunch" that cannot be considered. Renewed Motion to Suppress at

11-12; see United States v. Massenburg, 654 F.3d 480, 485 (4th
Cir. 2011) ("Evidence that would support only 'a mere "hunch" is
insufficient,' though a reasonable basis need not establish
probable cause and may well 'fall[] considerably short of
satisfying a preponderance of the evidence standard.'") (quoting
United States v. Arvizu, 534 U.S. 266, 274 (2002)). That
categorization does not align with the facts of this case. Ms.
Dickens gave the tip that Fuller had an outstanding arrest warrant
in response to overhearing Officer Hughes' remark to Officer Moore
that, "we really don't have anything criminal yet." Ex. 4A, at 3.
She interjected that statement into the officer's conversation to
explain that they did have "something criminal" because she was
"pretty sure" that Fuller had an outstanding arrest warrant. Id.
She then followed up, after Officer Hughes asked for confirmation,
that she was "pretty sure" that Fuller had an outstanding arrest
warrant. Id. To be "pretty sure" of something connotes a high level
of confidence that one is correct in what they are asserting. See
Sure, CAMBRIDGE ONLINE DICTIONARY ("sure: certain; without a doubt"),
available at https://dictionary.cambridge.org/dictionary/english
/sure (last visited August 5, 2025).

Fuller's argument on this point boils down to the contention
that the tip is not reliable because Ms. Dickens did not speak
with certainty (given the use of a qualifier, "pretty sure" instead
of "certain"), in her statement that Fuller had a warrant. Fuller

also takes the view that Ms. Dickens "provided no facts on which her assertion of illegality was based" because "it wasn't even an assertion." Renewed Motion to Suppress at 11-12. According to Fuller, Ms. Dickens "merely expressed what she herself held as a subjective opinion." Id. That is not what happened. Ms. Dickens actually made an assertion of illegality (that Fuller had an outstanding warrant for his arrest). She followed up her initial assertion with a confirming assertion that it was her belief that Fuller had a warrant. The use of a qualifying term, such as "pretty sure," does not automatically transform what is otherwise an assertion of illegality into a "hunch." That is particularly so where, as here, the qualifying term is a figure of speech that connotes certainty, not doubt.

Finally, Fuller argues that Christmas is not applicable to this interaction because Ms. Dickens did not make an assertion of illegality for which she could be held accountable. Renewed Motion to Suppress at 11-12 (quoting J.L., 529 U.S. at 272 (a tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person.")). This argument addresses the Fourth Circuit's finding in Christmas that face-to-face encounters are more credible because the tipster can "be held accountable for false statements," while an anonymous tipster cannot. 222 F.3d at 144. And, according to Fuller, Ms. Dickens could not be held accountable because she used the qualifying language, "pretty

sure." The problem with that argument is twofold. First, there was an assertion of illegality by Ms. Dickens, that Fuller had an outstanding arrest warrant, which exposed Ms. Dickens "to the repercussions of misleading or deceiving the police," if the statement were untrue. Id. Use of the qualifying language does not, as Fuller argues, eliminate that exposure. Second, the Fourth Circuit reasons that face-to-face encounters are more credible because "they typically provide a measure of accountability **and an opportunity to evaluate the informant's credibility and demeanor**." United States v. Mitchell, 963 F.3d 385, 393 (4th Cir. 2020) (emphasis added) (citing Christmas, 222 F.3d at 143-144). Officer Hughes testified that he took into consideration Ms. Dickens' **demeanor** through "looking at her" and seeing "the emotion with which she said [the statements at issue]." H.T. 7/9/25, at 92:12-15. In addition, courts have considered the fact that informants publicly giving tips open themselves up to the possibility of retaliation, a circumstance that further bolster's their credibility. Christmas, 222 F.3d at 144. Ms. Dickens' reliability is, thus, boosted further because she was interacting with the officers publicly when she made the statement and "expos[ed] herself to the risk of reprisal." Mitchell, 963 F.3d at 393 (citing Christmas, 222 F.3d at 144).

For the foregoing reasons, the Court finds that Ms. Dickens' tip is sufficiently reliable to be taken into account in making

the reasonable suspicion analysis that preceded the seizure of Fuller (which, of course, also included the fact that Fuller was fleeing the scene before the seizure occurred).

### ii. Reasonable Suspicion: Totality of the Circumstances

That brings the analysis to "the totality of the circumstances [considered] when deciding whether an officer had reasonable suspicion to support a Terry stop and frisk." United States v. McCullers, 591 F. Supp. 3d 38, 46 (E.D. Va. 2022), aff'd sub nom. United States v. Brown, 114 F.4th 253 (4th Cir. 2024) (citing United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002)). "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion[.]" Ornelas v. United States, 517 U.S. 690, 696 (1996). When deciding the issue, the Court takes into consideration facts that both help and undermine the Government's theory of reasonable suspicion. See Nazario v. Gutierrez, 103 F.4th 213, 226-228 (4th Cir. 2024) (taking into consideration facts that narrowed an officer's theory of probable cause when completing a totality of circumstances analysis). "In reviewing police action, courts must look at whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually

refuted, remaining mindful of 'the practical experience of officers who observe on a daily basis what transpires on the street.'" United States v. Bowman, 884 F.3d 200, 213 (4th Cir. 2018) (quoting United States v. Branch, 537 F.3d 328, 336-37 (4th Cir. 2008) (internal quotation marks omitted)).

The Government argues that, at the time of the Terry stop, Officer Hughes had reasonable suspicion that Fuller had committed a criminal offense based on Officer Hughes' suspicion that Fuller had an outstanding warrant for his arrest.[4] "'[O]f course, an officer may stop and question a person if there are reasonable grounds to believe that person is wanted for past criminal conduct.'" United States v. Hensley, 469 U.S. 221, 227 (1985) (quoting United States v. Cortez, 449 U.S. 411, 417 n.2 (1981)). The Fourth Circuit in United States v. Quarles, 330 F.3d 650 (4th Cir. 2003), affirmed that officers may perform a Terry stop if there is reasonable suspicion that the individual has an outstanding arrest warrant until the officer could verify whether that warrant exists. Therefore, the analysis in this case turns on whether Officer Hughes' had a reasonable suspicion that Fuller had an outstanding arrest warrant.

---

[4] Resp. at 14 (quoting Arizona v. Johnson, 555 U.S. 323, 326 (2009) (Establishing reasonable suspicion where "the police officer reasonably suspects that the person apprehended is committing or *has committed a criminal offense*.") (emphasis added)).

As discussed above, we examine the totality of the circumstances, after excising the "look" from Ms. Dickens and the attending statement ("like I said that tells you all what he does for a living, because what the f**k is y'all doing?"), which preceded the moment of seizure. The Government contends that the following facts led to Officer Hughes' reasonable suspicion: (1) Ms. Dickens' tip that Fuller had an outstanding warrant; (2) the evasive behavior taken by Ms. Bryce and Fuller to avoid interacting with the officers; and (3) because the officers were responding to a domestic disturbance call "which carries with it an inherently heightened need for investigation due to its volatile and dangerous nature."[5] Resp. at 17-25. The Government succeeds in its argument that Officer Hughes had reasonable suspicion that Fuller had an outstanding warrant, albeit only for two of those three reasons.

First, Officer Hughes was relying upon a tip from Ms. Dickens that Fuller, her daughter's boyfriend who was living in her home

---

[5] The Government also contends that a fact to be considered in the mix of the totality of the circumstances is that Fuller was wearing a face covering when he exited out of the townhouse that obscured his neck. The Court finds that nothing about that fact raises Officer Hughes reasonable suspicion that Fuller had an arrest warrant. First, Fuller's face was fully visible to the officers. Second, the detention occurred during the winter, December 27, 2024, when it was cold outside, so it was normal for Fuller to be wearing something that would cover his neck. Just because Officer Hughes would like to see an individual's neck to check for tattoos and other distinctive markings does not mean that Fuller wearing a neck covering raises reasonable suspicion that criminal activity may be afoot.

at the time, had an outstanding arrest warrant. The Fourth Circuit has relied upon tips from individuals with lesser personal knowledge of those detained than Ms. Dickens had of Fuller in deciding that reasonable suspicion existed. Cf. Christmas, 222 F.3d at 144 (finding that the proximity of a woman living two doors away made it reasonable to conclude that she would be a reliable informant). In Quarles, the Fourth Circuit expressed reliance upon a tip given by a 911 caller, who had in the Fourth Circuit's opinion sufficiently identified himself and corroborated his tip, that an individual had an outstanding warrant for arrest. 330 F.3d at 654-655. The Court is confronted with the same situation as presented to the Fourth Circuit in Quarles: a tip from an informant, with personal knowledge, that an individual has an outstanding warrant. Here, Ms. Dickens' tip weighs heavily in favor of finding that reasonable suspicion existed. While likely sufficient by itself to establish reasonable suspicion, Officer Hughes was confronted with other behavior that further raised his reasonable suspicion.

To be specific, Officer Hughes was confronted by three instances of evasive behavior by Fuller and Ms. Bryce, albeit only one of those instances may be attributed to Fuller. First, Ms. Bryce immediately engaged in evasive behavior when she encountered the officers at the front door of the townhouse. When opening the door in response to Officer Hughes, Ms. Bryce opened the door only

part way so that the officers could see her face but could not see into the townhouse. Ex. 4, at 12:24:50-12:24:56. Officer Hughes asked, "do you mind if we come in?" Id. at 12:24:54-12:25:00. Ms. Bryce responded "gimme one second," and immediately closed the door and locked the deadbolt. Id.; H.T. 7/9/25, at 26:1-11. In Officer Hughes' experience as a police officer, behavior such as quickly closing and locking a door when faced with a police officer does not happen "very often in domestic disputes" but is more common when he is dealing with an individual that is engaged criminal activity or has an outstanding arrest warrant. H.T. 7/9/25, at 26:12-27:14. While not attributable to Fuller, this activity is suspicious and can be taken into consideration under the totality of the circumstances.

The second instance of evasive behavior was Ms. Bryce stating that she would be returning to the front door but failing to do so. While Officer Hughes waited for Ms. Bryce to return to the door to speak with him, he knocked for a second time and received in response a shouted "I'm coming" from Ms. Bryce. Ex. 4, at 12:26:12-12:26:16. Officer Hughes perceived that Ms. Bryce was not coming to the door but had instead moved further back into the house. H.T. 7/9/25, at 29:2-6. Officers Hughes and Geukgeuzian continued to wait at the front door of the apartment for a few minutes, but Ms. Bryce never returned. Again, this behavior is not

attributable to Fuller but may be considered as part of the totality of the circumstances.

The failure to return to the front door leads to the third instance of evasive behavior: Fuller and Ms. Bryce exiting the townhouse through the backdoor to avoid interaction with the officers notwithstanding that Ms. Bryce had represented to officers that she would be returning to speak with them. That, according to the government, was "textbook evasive behavior, here executed by two parties in tandem." Resp. at 20. This evasive behavior is fully attributable to Fuller.

It is settled that "'[e]vasive conduct, although stopping short of headlong flight,' is . . . an important factor for a court to consider when making a reasonable suspicion determination." United States v. Bumpers, 705 F.3d 168, 175 (4th Cir. 2013) (quoting United States v. Lender, 985 F.2d 151, 154 (4th Cir.1993); citing Wardlow, 528 U.S. at 124, 120 S.Ct. 673; United States v. Sharpe, 470 U.S. 675, 682 n. 3, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). Ms. Bryce and Fuller immediately began to engage in evasive behavior upon the officers response to 5868 Kirkstone Circle, and, under the totality of the circumstances considered in the Terry analysis, that behavior weighs in favor of finding that Officer Hughes had reasonable suspicion that Fuller had an outstanding warrant. See, e.g., United States v. Brown, 114 F.4th 253, 259 (4th Cir. 2024) (finding that an officer's reasonable

suspicion was heightened when faced with individuals who "immediately started to leave the area and ignore[d] the officers' commands once the officers approached them."); see also Bumpers, 705 F.3d at 175-176 (finding that the "evasive behavior" of quickly walking away from a scene upon seeing a police vehicle was a "'pertinent factor' that contributed to the reasonable suspicion determination.") (quoting Wardlow, 528 U.S. at 124, 120 S.Ct. 673). Thus, the tip from Ms. Dickens taken in light of the actions that Ms. Bryce and Fuller took to evade interaction with the officers is sufficient to form a legally supportable reasonable belief that criminal activity is, or may be, afoot. Therefore, Fuller was lawfully detained when he was seized on the back porch of 5868 Kirkstone Circle as he was exiting the back door of the townhouse.

### E. Suppression of the Firearm

Fuller argues that the pre-existing warrant did not sufficiently attenuate the Fourth Amendment violation that Officer Hughes committed, and, thus, the evidence of the firearm that was seized from Fuller's backpack should be suppressed. Renewed Motion to Suppress at 15-19. That argument fails because no underlying Fourth Amendment violation exists to allow for suppression of the firearm. So, the attenuation argument need not be addressed.

## CONCLUSION

For the reasons set forth above, the GOVERNMENT'S POST-HEARING RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS (ECF No. 29) will be DENIED.

It is so ORDERED.

_____ /s/ _R EP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: August 15, 2025